**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HOWARD BLOOM, D.C. and** | : | **CIVIL ACTION** |
| **WEATHER VANE CHIROPRACTIC, P.C.,** | : | |
| **Plaintiffs,** | : | |
| | : | **No. 14-2582** |
| **v.** | : | |
| | : | |
| **INDEPENDENCE BLUE CROSS** *et al.*, | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                                          **JULY 31, 2015**

**MEMORANDUM**

This case involves the broad but sometimes hard to define scope of jurisdiction under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The central question: is this case a simple payment dispute, unworthy of federal jurisdiction, or are Plaintiffs, even though they are providers, properly raising an issue as to the scope of patients' coverage, giving rise to interests protected by ERISA?

Plaintiffs are Dr. Howard Bloom, a chiropractor, and his practice, Weather Vane Chiropractic, P.C. Defendants are insurance providers, Independence Blue Cross, Inc. ("IBC"), QCC Insurance Company, Keystone Health Plan East, Inc., and AmeriHealth HMO, Inc. From May 2005 until October 2013, Dr. Bloom was a participating provider in Defendants' network of health care providers. Together, Defendants and Dr. Bloom, as an in-network provider, offered medical services to plan beneficiaries under the terms of their health care plans ("IBC Plans"). During the course of his business relationship with Defendants, Dr. Bloom's individual rights and duties as an in-network provider were separately governed by a Professional Provider Agreement ("Provider Agreement").

1

Plaintiffs assert that IBC rescinded coverage for certain medical procedures, after allegedly covering those same services for years, and have brought suit to enforce what they contend are their individual and derivative rights under the relevant IBC plans governed by ERISA.  Specifically, Plaintiffs allege that Defendants' retroactive denial of covered benefits amounted to an "Adverse Benefits Determination" under ERISA, triggering the notice and appeal process afforded to plan beneficiaries by the statute.  In addition, Plaintiffs directly bring supplemental state law claims, including breach of the Provider Agreement, fraud, negligent misrepresentation, and malicious prosecution.  Defendants have moved to dismiss the entirety of Plaintiffs' First Amended Complaint, arguing Plaintiffs fail to state plausible ERISA claims, depriving this Court of subject matter jurisdiction.  Because I am persuaded that Plaintiffs allege an ERISA coverage dispute under the IBC Plans via a valid assignment of rights from the plan participants, as opposed to a simple payment dispute under the Provider Agreement, Defendants' Motion to Dismiss will be denied.

## I.     Relevant Facts Alleged in Plaintiffs' First Amended Complaint

Plaintiffs' First Amended Complaint includes various details of the dispute that are not essential to resolving the instant Motion to Dismiss.  In the description of the facts below, I focus only on those allegations that are particularly relevant to the current Motion.

Dr. Howard Bloom is a licensed chiropractor in Pennsylvania who conducts his professional practice through Plaintiff Weather Vane Chiropractic, P.C. ("Weather Vane").  First Amended Complaint ¶ 15.  Including its subsidiaries, Plaintiff identifies Defendant IBC as the leading health insurer in southeastern Pennsylvania, administering health insurance benefits of more than 2.2 million Pennsylvanians.  *Id.* at ¶ 21.

"Pursuant to the terms of the applicable IBC Plans, IBC is required to provide IBC Plan Beneficiaries with payment or reimbursement for specified covered health care services ('Covered Services')." *Id.* at ¶ 22. "IBC Plan Beneficiaries" include direct plan participants, as well as their eligible spouses and children. *Id.* at ¶ 5. In order to receive the full extent of benefits under the IBC Plans, beneficiaries are often required to obtain Covered Services by utilizing "in-network" or "participating providers," since those providers have contractually agreed to participate in the applicable IBC plan and to render care on a fixed fee basis, as separately regulated by individual "provider agreements." *Id.* at ¶ 22. Stated differently, the IBC Plans control what services are considered "Covered Services" for beneficiaries, while provider agreements dictate the rights and responsibilities of the provider in performing those services. Of greatest significance here, the Provider Agreement at issue, which sets fees, does not in any way purport to control what medical services are eligible for coverage under the relevant IBC plans.

In May 2005, Dr. Bloom signed a Professional Provider Agreement with Defendants QCC, Keystone, and AmeriHealth (together, "Independence"). *Id.* at ¶ 37. The purpose of the Agreement is readily apparent on the first page: "Independence and [Dr. Bloom] mutually desire to enter into this Agreement whereby [Dr. Bloom] shall render Covered Services to Beneficiaries of the various Benefit Programs and shall be compensated by Independence therefor, as more explicitly described hereafter." Memorandum of Law In Support of Defendants' Motion to Dismiss, Exhibit A at 1. "Covered Services" are defined in the Provider Agreement as "Medically Necessary health care services and supplies that are to be provided by [Dr. Bloom] to Beneficiaries for which a Beneficiary has coverage pursuant to the applicable Benefit Program or Benefit Program Agreement." *Id.* at ¶ 1.10.

Patients at Dr. Bloom's practice, Weather Vane, ordinarily signed a standard "Financial Policy" form, which included the following assignment clause: "THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY."  First Amended Complaint at ¶ 122.  Weather Vane's services included massage therapy provided by licensed massage therapists, known as "Delegated Adjunctive Therapeutic Massage Procedures" ("DATMP").  *Id.*  Weather Vane provided DATMP to patients "for more than five years prior to 2006."  *Id.* at ¶ 47.  During the pre-2006 time period, Defendants considered DATMP to qualify as a Covered Service under the relevant IBC plans and paid Dr. Bloom directly for those procedures.  *Id.*

In 2006, IBC issued a billing guide supplement that informed participating providers that IBC would cover massage, but would not cover any services performed by a massage therapist. *Id.* at ¶¶ 49–51.  The guide provided: "Note: IBC does not provide reimbursement for services that are performed by a massage therapist.  This applies to independently practicing massage therapists as well as those who are employed and supervised by an eligible health care professional."  *Id.* at ¶ 51.

Dr. Bloom alleges the note "was not incorporated or referenced in the Provider Agreement or, on information and belief, in the plan documents of IBC Plan Beneficiaries."  *Id.* at ¶ 53.  Accordingly, Dr. Bloom submits that the billing note did not, and could not, preclude reimbursement for DATMP.  *Id.* at ¶ 54.  Moreover, Dr. Bloom alleges that despite the billing note, IBC continued to pay for DATMP services provided to beneficiaries who were covered for such procedures under their applicable IBC plans.  *Id.* at ¶ 55.

However, IBC reversed course in 2007 and demanded reimbursement for "overpayments" made to Dr. Bloom and other Pennsylvania chiropractors by Keystone for

4

massage services provided to their insureds from 2006 to 2007, claiming those massage procedures were not Covered Services under the applicable Keystone plans.  *Id.* at ¶ 56.  After receiving pushback regarding the legality of the overpayment notices from the Pennsylvania Chiropractic Association and numerous individual chiropractors—specifically whether the procedures were Covered Services under the plans and whether IBC had the legal right to recover payments retroactively—IBC suspended its recollection efforts.  *Id.* at ¶ 57.  IBC resumed its recollection efforts in December 2008.  *Id.* at ¶ 58.  Dr. Bloom initially entered an agreement to repay IBC in installments, subject to a reservation of his rights to recover those repayments, but he ceased payments when he learned of a lawsuit challenging IBC's right to recover under the circumstances.  *Id.* at ¶¶ 59–60.

In an alleged attempt to discourage other chiropractors from delegating activities to unlicensed support personnel, IBC decided to refer accusations of insurance fraud against Dr. Bloom to the state Attorney General in or around 2009.  *Id.* at ¶¶ 62–65.  Nonetheless, IBC continued to pay for massage services reported by Weather Vane from 2008 until Dr. Bloom's arrest in 2011.  *Id.* at ¶ 66.

IBC issued a Medical Policy Bulletin effective June 18, 2008, which included a provision that specified IBC "does not provide reimbursement for services that are performed by someone other than an eligible health care provider …. This includes massage therapists."  *Id.* at ¶ 68.  Subsequent 2009 and 2011 Bulletins contain the same or similar provisions.  *Id.* at ¶¶ 70–71.  However, despite these bulletins, Dr. Bloom contends that IBC has in fact continued to reimburse providers for services that the provider delegates to subordinates, such as physical therapists who delegate to assistants.  *Id.* at ¶ 72, 85.

5

On January 4, 2013, Dr. Bloom was acquitted of all criminal charges. *Id.* at ¶ 91. Three days later, on January 7, 2013, IBC informed Dr. Bloom that IBC would require pre-payment review of all of his claims, requiring Plaintiffs to attach supporting medical records for every patient's claim(s). *Id.* at ¶ 93. By letter dated April 4, 2013, IBC advised Dr. Bloom of its intent to terminate his Provider Agreement unless he "cured" various alleged breaches within 30 days. *Id.* at ¶ 97. The April 4, 2013 letter further advised Dr. Bloom that in order to "cure" the alleged breaches, he would be required to repay $352,948 in overpayments, primarily for services rendered by massage therapists. *Id.* at ¶ 98. IBC subsequently began to unilaterally offset claims due to Dr. Bloom against the $352,948 in alleged overpayments. *Id.* at ¶ 99–100.

At IBC's request, Dr. Bloom submitted a Certificate of Compliance to IBC in May 2013. *Id.* at ¶ 101. Dr. Bloom alleges that up to 2013, IBC repeatedly confirmed that patients could receive coverage for DATMP performed by a massage therapist when Weather Vane employees would call IBC for pre-certification and confirmation of coverage. *Id.* at ¶ 102–106. By letter dated September 26, 2013, IBC informed Dr. Bloom that he had not cured the various material breaches of his Provider Agreement, and, as a result, his Provider Agreement would be terminated effective October 23, 2013. *Id.* at ¶ 107.

## II.    Plaintiffs' Claims

In their First Amended Complaint, Plaintiffs bring ten claims against Defendants challenging their conduct. The first four counts arise under the federal Employee Retirement Income Security Act ("ERISA"). The remaining counts allege violations of state law.

Plaintiffs' first count alleges Defendants violated ERISA based on the terms of the IBC ERISA Plans, claiming that Defendants' denial of benefits and efforts to retroactively rescind coverage through the recoup of payments constituted Adverse Benefits Determinations.

Accordingly, Plaintiffs contend that Defendants failed to comply with ERISA's statutory notice and appeal requirements in violation of federal law.

Plaintiffs' second count alleges that ERISA entitled them to a review of claims denials, and further that Defendants did not provide Plaintiffs with the review.  Plaintiffs claim that Defendants' failure to provide the required process entitles them to injunctive and declaratory relief as well as unpaid benefits.

Count Three of Plaintiffs' First Amended Complaint seeks clarification of "Plaintiffs' rights to future benefits under the terms of IBC ERISA Plans."  *Id.* at ¶ 178.  Specifically, Plaintiffs request a declaratory judgment establishing they are entitled to direct payments from IBC for DATMP.

Count Four asks the Court for an injunction to prevent Defendants from denying claims for DATMP in the future.

Plaintiffs' fifth count alleges a state law breach of contract claim.  Specifically, Plaintiffs assert IBC violated the Provider Agreement between Dr. Bloom and IBC.

Count Six asserts a claim of promissory estoppel against Defendants.  According to Plaintiffs, Defendants repeatedly confirmed to Plaintiffs' employees that patients could receive "therapeutic massage when performed by a licensed massage therapist."  *Id.* at ¶ 194.  Plaintiffs acted on those confirmations and provided the service, and Plaintiffs argue that Defendants should be estopped from now claiming those services were not covered.

Count Seven alleges IBC intentionally interfered with Plaintiffs' contractual relations with their patients who have IBC insurance plans.

Count Eight brings a claim of common law fraud against IBC.  Plaintiffs allege that IBC defrauded Plaintiffs by pre-certifying DATMP when IBC knew that it would not reimburse Plaintiffs for the services.

Plaintiffs' ninth count alleges IBC negligently misrepresented its policies by pre-certifying DATMP.

Count Ten asserts a claim of malicious prosecution against Defendants.  Plaintiffs claim Defendants misled the Pennsylvania Office of the Attorney General into filing criminal charges against Dr. Bloom.

### III.   Defendants' Motion to Dismiss

Defendants argue that Plaintiffs lack standing to bring their federal claims, depriving this Court of jurisdiction.  Defendants contend that the ERISA statute under which Plaintiffs' claims arise does not authorize Plaintiffs to bring those claims, and that the dispute in this case does not implicate ERISA at all, characterizing the issue as a simple matter of contract under the Provider Agreement.  Defendants conclude by arguing that because Plaintiffs' federal claims should be dismissed, this Court should decline to retain supplemental jurisdiction over Plaintiffs' state law claims.

### a.   Standard of Review

Defendants' Motion to Dismiss, brought pursuant to Fed. R. of Civ. P. 12(b)(1) and (6), challenges Plaintiffs' standing and thus this Court's jurisdiction to hear Plaintiffs' claims. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."). Plaintiffs bear the burden of showing the Court has jurisdiction.  *Id.*  Though the jurisdictional burden of proof rests on the Plaintiffs' shoulders, in construing the allegations

8

before the Court, I "must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Id.*

      *b.  Plaintiffs' Standing under ERISA*

Plaintiffs assert several grounds for standing.  They first argue that they have standing to bring ERISA claims because they are directly "beneficiaries" of the insurance plans at issue in this case.  Alternatively, Plaintiffs argue that even if they are not directly "beneficiaries," then they have standing via a valid assignment, allowing them to stand in the shoes of their patients, who would unquestionably have standing to bring an ERISA action as plan participants.

      i.  Whether Plaintiffs Have Direct Standing under ERISA as Beneficiaries

ERISA authorizes only certain categories of persons to bring civil actions to enforce ERISA's requirements: "participants," "beneficiaries," "fiduciaries," and the Secretary of Labor. 29 U.S.C. § 1132(a).  The statute also defines which classes of persons may bring which civil actions.  Of relevance here, the statute provides that a "participant or beneficiary" may bring an action to obtain certain information from a plan administrator, "to recover benefits due to him … to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.*  A participant or beneficiary may also bring a suit to enjoin "any act or practice which violates any provision of this subchapter or the terms of the plan." *Id.* at (a)(3). 29 U.S.C. § 1002(8) defines "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."

Plaintiffs contend that they have standing as beneficiaries for the purposes of 29 U.S.C. § 1132, arguing that once Dr. Bloom provided services to insured patients, Dr. Bloom became "entitled to a benefit"—specifically, payment for the covered services he provided patients.

According to Plaintiffs, this entitlement also empowers Dr. Bloom with the right to bring a civil action pursuant to 29 U.S.C. § 1132 if IBC fails to comply with ERISA's requirements.

ERISA does not, on its face, explicitly reject the possibility that a provider of medical services could become a beneficiary with standing to sue, but most cases have rejected such an interpretation. *See, e.g.*, *Chiropractic Nutritional Assoc., Inc. v. Empire Blue Cross and Blue Shield*, 669 A.2d 975, 980 (Pa. Super. Ct. 1995) ("It is clear that health care providers do not have independent standing to sue under ERISA because they are 'non-enumerated' parties."); *Hobbs v. Blue Cross Blue Shield*, 276 F.3d 1236, 1241 (11th Cir. 2001) ("Healthcare providers such as physician assistants generally are not considered "beneficiaries" or "participants" under ERISA."). The term "beneficiary," at least one court has persuasively reasoned, "carries the connotation of a person, other than the employee-participant, who is covered by the plan's provisions—e.g., a spouse or dependent," rather than a medical provider. *Cameron Manor, Inc. v. United Mine Workers of America*, 575 F.Supp. 1243, 1245–46 (W.D. Pa. 1983) ("we conclude that the term ["beneficiary"] as employed in the statute does not permit of a construction broad enough to include a provider of health services to participants"). *See also Northeast Dept. ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 154 (3d Cir. 1985) (holding that a pension fund lacked standing to sue under ERISA because it was not an enumerated party under 29 U.S.C. § 1132).

Furthermore, other cases have considered the rights of medical services providers to sue insurance companies and found they may sue with *indirect* standing after receiving an assignment of the right to sue from an insured patient. *See CardioNet, Inc. et al. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014); *Zaszlow v. Miles*, 1998 WL 855496, at * 2 (E.D. Pa. Dec. 9, 1998) ("Numerous district courts in this circuit … have held that health care providers have

standing to sue under § 1132(a)(1)(B) where there has been an assignment of rights under the plan."). Standing through assignment would be unnecessary if providers could sue directly as beneficiaries.

Plaintiffs rely on what may be the only case to have accepted medical providers as beneficiaries with direct standing to sue. In *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2014 U.S. Dist. LEXIS 41749 (N.D. Ill. March 28, 2014), the Court held that medical providers were beneficiaries under the terms of the insurance plan at issue. 2014 U.S. Dist. LEXIS 41749, at *43–44 (N.D. Ill. March 28, 2014). The court reasoned that the term "benefits" in ERISA is broad enough to encompass the payment of money. *Id.* at *30. The Plan at issue provided that physicians would receive payments directly from the insurance company, and so, the court concluded, physicians receiving payments were "beneficiaries" with standing to bring civil actions to enforce ERISA's rules. *Id.* at *43.

Plaintiffs contend that *res judicata* or *collateral estoppel* require this court to accept the decision of *Pa. Chiropractic* in this case. I disagree. In their First Amended Complaint, Plaintiffs argue that the question of whether participating providers who provided medical services to patients insured by Defendants "was actually litigated by IBC" in *Pa. Chiropractic*, the issue was adjudicated against IBC, IBC was fully represented in the case, and the "determination of the issue was a necessary part of the decision against IBC." First Amended Complaint ¶ 127.

*Res Judicata* does not apply here because Plaintiffs were not parties in *Pa. Chiropractic*. The Third Circuit recently recited the requirements for *res judicata*:

> [c]laim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding. Claim preclusion requires: (1) a final judgment on

the merits in a prior suit involving; (2) the same parties or their privities [sic]; and (3) a subsequent suit based on the same cause of action.

*Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 276 (3d Cir. 2014) (quoting *Bd. of Trs of Trucking Emps. Of N. Jersey Welfare Fund, Inc.—Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992)).  The Plaintiffs in this case were not involved in *Pa. Chiropractic*, and so, by definition, *res judicata* or claim preclusion cannot apply.

Nor does collateral estoppel apply.  In general courts may find a party is estopped from re-litigating an issue when:

"(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment."

*National R.R. Passenger Corp. v. Pennsylvania Utility Com'n*, 342 F.3d 242, 252 (3d Cir. 2003). These technical elements are satisfied here.  However, where a plaintiff seeks to use collateral estoppel offensively, trial courts have "broad discretion to determine when it should be applied." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979).  If "the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel."  *Id.*  One circumstance in which applying offensive collateral estoppel would be unfair to a defendant arises "if the judgment relied on as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant."  *Id.*  As discussed above, numerous other courts have disagreed with the holding in *Pa. Chiropractic*. Seizing on one adverse decision to the exclusion of all others would be unfair.

I conclude that Plaintiffs are not beneficiaries with direct standing to bring their claims under ERISA.  Next I must consider Plaintiffs' alternative theory for standing: derivative standing after an assignment of benefits from Plaintiffs' patients as plan participants.

ii.   Whether Plaintiffs have Derivative Standing under ERISA

As a general matter, providers of medical services can acquire derivative standing through an assignment of rights from their patients.  In *CardioNet*, the Third Circuit adopted the "majority position that health care providers may obtain standing to sue by assignment from a plan participant." *CardioNet*, 751 F.3d at 176 n.10.  Thus, if Plaintiffs received a valid assignment of rights from their insured patients, they have standing to bring their ERISA claims against Defendants.

Recognizing that a valid assignment of rights from patients to a provider can confer standing, Defendants argue that any assignment from Dr. Bloom's patients is invalid because of an anti-assignment provision in the relevant insurance plans.  The anti-assignment clause that appears in all the relevant plans states:

> The right of a Covered Person to receive benefit payments under this coverage is personal to the Covered Person and is not assignable in whole or in part to any person, Hospital or other entity nor may benefits of this coverage be transferred, either before or after Covered Services are rendered . . . .

Memorandum of Law in Support of Defendants' Motion at 8.

The Third Circuit has not conclusively answered the question of whether an anti-assignment provision in an ERISA Plan can invalidate a patient's assignment to an in-network provider such as Dr. Bloom.  Similar anti-assignment provisions have been enforced in other circuits. *Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir. 2004); *City of Hope Nat. Med. Center v. HealthPlus, Inc.*, 156 F.3d 223, 229 (1st Cir. 1998) ("ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to the negotiations of the contracting parties"); *St. Francis Regional Medical Center v. Blue Cross and Blue Shield of Kansas, Inc.*, 49 F.3d 1460, 1464 (10th Cir. 1995); *Cohen v. Independence Blue Cross*, 820 F. Supp. 2d 594 (D.N.J. 2011); *Briglia*

13

*v. Horizon Healthcare Servs., Inc.*, 2005 WL 1140687, at *4–5 (D.N.J. May 13, 2005) (collecting "a number of federal and state courts [which] have found that unambiguous anti-assignment provisions in group health care plans are valid."); *Chiropractic Nutritional Assoc., Inc. v. Empire Blue Cross and Blue Shield*, 669 A.2d 975, 981 (Pa. Super. Ct. 1995) ("We are persuaded … that ERISA's silence as to the issue of assignability of group health benefits leaves the matter open for agreement between the contracting parties.").

Plaintiffs argue that this matter is distinguishable from the line of cases referenced above for two reasons.  First, they claim that the anti-assignment provision bans only the assignment of the right to receive *benefit payments*, and does not prevent patients from assigning their right to bring an ERISA action contesting *coverage* in the event benefits are denied (i.e., when faced with an Adverse Benefit Determination).  Second, Plaintiffs contend that Defendants waived their right to assert the anti-assignment provision through their conduct.

Plaintiffs support their contention that IBC's anti-assignment provision applies to benefits payments but not coverage disputes in several ways.  First, they argue that Pennsylvania state courts "have recognized that the right to assign a *cause of action* is separate and distinct from the right to assign *benefits*."  Plaintiffs' Opposition at 11.  Defendants' anti-assignment clause only discusses the right to receive benefit payments, and so, by its literal terms, does not prevent patients from assigning their rights to bring ERISA lawsuits.[1]  In fact, the entire clause as

---

[1] I note that this reading of the anti-assignment clause appears consistent with a distinction drawn by the U.S. Department of Labor's ("DOL") in its interpretation of "an assignment of benefits."  While not dispositive, the DOL's website includes an instructive section titled "FAQs About The Benefit Claims Procedure Regulation" that specifically distinguishes an assignment of the right to *receive benefit payments* with an assignment of the *right pursue a coverage dispute and appeal a benefit determination*, as follows:

**B-2: Does an assignment of benefits by a claimant to a health care provider constitute the designation of an authorized representative?**

No.  An assignment of benefits by a claimant is generally limited to assignment of the claimant's right to *receive a benefit payment* under the terms of the plan.  Typically, assignments are not a

phrased *assumes coverage*, discussing the rights of a "Covered Person" to receive payments for "Covered Services" under "this coverage." Accordingly, the plain terms of the assignment clause do not address or even refer to disputes as to coverage.

Second, Plaintiffs argue that the purpose of the anti-assignment provision cannot have been intended to prevent patients from assigning their rights to medical providers who provided covered services. Specifically, Plaintiffs maintain that although anti-assignment clauses might validly be used to prevent assignments of benefits to unrelated third-parties, such as creditors or out-of-network providers, the purpose of an anti-assignment clause in an ERISA plan cannot logically extend to prohibiting assignments to the providers who form the network through which the benefits protected by ERISA are provided. Moreover, "[d]enying standing to in-network health care providers to bring claims as assignees of plan participants undermines ERISA's goal of improving benefit coverage for employees." Plaintiffs' Opposition at 12 (citing *Lutheran Med. Ctr. of Omaha, Neb. v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan*, 25 F.3d 616, 619 (8th Cir. 1994), *abrogated on other grounds by Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966 (8th Cir. 2002)). Given ERISA's public policy goals, specifically in the context of protecting participants' rights to covered medical benefits, if Defendants intended to limit patients' rights to assign coverage disputes to providers, it was a matter of such central importance that it should have been explicitly addressed.

Cases have recognized that different rights can be independently assignable. The Pennsylvania Superior Court in *Chiropractic Nutritional Assocs., Inc. v. Empire Blue Cross and*

---

grant of authority to act on a claimant's behalf *in pursuing and appealing a benefit determination under a plan*.

UNITED STATE DEPARTMENT OF LABOR, Employee Benefits Security Administration, FAQs About The Benefit Claims Procedure Regulation, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited 7/27/15) (emphasis added).

*Blue Shield* considered whether an anti-assignment provision restricted patients from assigning the right to sue following a denial of benefits. 669 A. 2d at 981–82. The anti-assignment provision at issue read: "The right of a member to receive payment is not assignable." *Id.* at 982. The court decided, "we find nothing in the instant provision which prevents a subscribing member from assigning his or her right to bring an action to enforce the contract in the event that benefits are denied." *Id.*; s*ee also Hermann Hosp. v. MEBA Medical and Benefits Plan*, 959 F.2d 569, 573 (5th Cir. 1992) ("The right to sue for denial of coverage is separate and distinct from the right to sue to recover payment for Plan benefits rendered by [the medical provider] and covered under the Plan."), *overruled on other grounds by Access Mediquip, L.L.C. v. UnitedHealthCare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012).

Defendants rely heavily on *Cohen v. Independence Blue Cross*, 820 F.Supp. 2d 594, 607 (D.N.J. 2011), where the court found that a provider lacked standing under ERISA because of an anti-assignment provision that was identical to the one in this case. The plaintiff in *Cohen* generally challenged the enforceability of anti-assignment clauses in ERISA plans as a matter of law. *Id.* at 604–06. However, from the issues addressed in the opinion, the *Cohen* plaintiff apparently did not raise the Plaintiffs' most compelling arguments here, namely the key distinction between *the right to benefit payments* and *the right to dispute coverage under ERISA*. Defendants also rely on *Briglia v. Horizon Healthcare Servs. Inc.*, 2005 WL 1140687, at *5. The applicable clause in *Briglia* read: "Covered Persons may not assign any rights to *coverage or benefits* under this Policy without Horizon BCBSNJ's advance written consent." *Id.* (emphasis added). Finding the clause "unambiguous" and enforceable, the *Briglia* Court dismissed the plaintiff's denial of benefits claims under ERISA. *Id.*

Aside from these distinctions, I find it important that the *Cohen* and *Briglia* decisions pre-dated *CardioNet* where, in deciding an issue of arbitrability, the Court of Appeals concluded that the key question was whether the dispute involved payment under the provider agreement or coverage for services under the benefit plans. *CardioNet*, 751 F.3d at 177.   Once the availability of medical services is implicated, ERISA is triggered, empowering patients to invoke their rights under the statute. *See id.* ("claims challenging the denial of service may be brought *only* outside the confines of the [Provider] Agreement, through ERISA").   I have no doubt that ERISA coverage disputes fall into an entirely different category of claims than state law breach of contract actions over the right to receive benefit payments under a provider agreement.

It has taken me a great deal of reflection to reach a somewhat unsatisfying conclusion: at a minimum, the anti-assignment clause is ambiguous.   "Contractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' "   *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).  The anti-assignment clause here prohibits the assignment of *the right to receive benefit payments*.   As opposed to the clear anti-assignment provision in *Briglia*, which applied to "any rights to coverage or benefits," the language of this clause may reasonably be interpreted to only cover the right to receive benefit payments—not the distinct right to pursue coverage under an ERISA insurance plan following an adverse benefit determination.

Because of the ambiguity, I resolve the question in favor of Plaintiffs, who purport to stand in the shoes of plan participants.   "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." *Madison Const. Co.*, 557 Pa. at 606, 735 A.2d at 106.  Resolving the interpretation of this anti-assignment provision in favor of Plaintiffs gives effect to the principles recently

emphasized by the Third Circuit in *CardioNet* regarding the "important public policy interests served by permitting providers to bring such claims on behalf of plan participants." *CardioNet*, 751 F.3d at179.  Assignments shift the burden of litigating disputes from patients to providers who "are better situated and financed to pursue an action for benefits owed for their services." *Id.* (citing *Herman Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d at 1289 n.13.  Consequently, before permitting an anti-assignment clause to undermine this public policy, courts should require a high level of specificity from insurers.

Perhaps even more instructive, the Third Circuit took pains in *CardioNet* to emphasize the difference between a claim seeking payment or reimbursement for coverage provided under a provider agreement, as compared to claims seeking coverage under a benefit plan—the very distinction that controls my interpretation of the anti-assignment clause in this case.

> As the Providers correctly note, CIGNA's argument to the contrary rests on a conflation of claims, such as this one, seeking *coverage* under a benefit plan, and claims seeking *reimbursement* for coverage provided.  The distinction is key.  As we explained in *Pascack Valley,* a provider may bring a contract action for an insurer's failure to reimburse the provider pursuant to the terms of the agreement, while a claim seeking coverage of a service may only be brought under ERISA.  388 F.3d at 403–04 (holding that a hospital had an independent breach of contract action against the insurer because "the dispute here is not over the *right* to payment, which might be said to depend on the patients' assignments to the Providers, but the *amount,* or level, of payment, which depends on the terms of the provider agreements" (emphasis in original; quotation marks and alterations omitted)); *see also Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.,* 187 F.3d 1045, 1051 (9th Cir.1999) (providers' claim not preempted by ERISA where they "arise from [insurer's] alleged breach of the provider agreements' provisions regarding fee schedules, and the procedure for setting them, not what charges are 'covered' under the [ ] Plan").  Here, the Providers' claims do not concern the amount of payment to which they are entitled under the Agreement, but the right to payment under the terms of the relevant plans.

*CardioNet*, 751 F.3d at 177–78.  Similarly, here, Plaintiffs' individual state law claims, as pleaded, are controlled by Dr. Bloom's Provider Agreement.  Plaintiffs' ERISA claims, on the other hand, are brought under "group plans governed by ERISA."  Plaintiffs' First Amended

Complaint at Count I.  Although Defendants argue that it "is evident that Plaintiffs' claims are based upon the [Provider] Agreement and not the terms of any ERISA-governed plan,"[2] I am required at this early stage to accept Plaintiffs' factual allegations as true and construe all inferences in their favor.

Although the coverage implications of Defendants' actions are not patently obvious at first, the implications are real.  In effect, plan beneficiaries are deprived of the services of an entire category of providers—licensed massage therapists.  The fact that Dr. Bloom can render the same service does not diminish the significance of the prohibition, because excluding an entire category of providers necessarily limits patient options.  One need only consider the medical specialty of family practice—where nurse practitioners and physician assistants now play prominent roles.  Eliminating their ability to provide services would necessarily affect patient access.  Accordingly, assuming Plaintiffs have lawfully been assigned the right to stand in the shoes of the plan participants, the First Amended Complaint pleads a plausible ERISA action seeking coverage of a specific service under the relevant plans.  Defendants are free to argue that "this dispute has nothing to do with ERISA beneficiaries or benefits" and "Plaintiffs are simply dissatisfied with the [Provider] Agreement" as this case proceeds on the merits, but Plaintiffs have complied with controlling pleading standards in order to move forward with their ERISA claims.  *Id.* at 15, 17.

Furthermore, even if I interpreted the anti-assignment provision in Defendants' favor, I would find that Plaintiffs have at least plausibly alleged facts showing IBC waived the provision. Paragraph 125 of Plaintiffs First Amended Complaint states that IBC:

> repeatedly and routinely provid[ed] Plaintiffs with written benefit summaries and telephone confirmation indicating that patients insured under IBC ERISA Plans had coverage for chiropractic care, *specifically including* confirmation of

---

[2] Defendants' Memorandum of Law in Support of Their Motion at 17.

> coverage for therapeutic massage when performed by a licensed massage
> therapist, and reported using CPT code 97124

Amended Complaint ¶ 125.  According to Plaintiffs, Defendants' decisions to pay

Plaintiffs for covered services for which Plaintiffs had received assignments of benefits

waived Defendants' right to deny the validity of those assignments.

"It is well settled that waiver may be established by conduct inconsistent with claiming

the waived right or any action or failure to act evincing an intent not to claim the right."  *Evcco*

*Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3d Cir. 1987).  A number of decisions

have held that insurance companies waived anti-assignment provisions by treating providers as

valid recipients of assignments.  *See, e.g. Productive MD, LLC v. Aetna Health, Inc.*, 969

F.Supp.2d 901, 926 (M.D. Tenn. 2013) (finding plaintiffs had "alleged a plausible waiver

theory"); *Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*,

2009 WL 3233427, at *6 (finding claim for waiver because "[a]lthough Horizon's direct

payments to GRS would not constitute a waiver if authorized under the Horizon plans at issue

…. the Complaint describes regular interaction between Horizon and GRS prior to and after

claim forms are submitted, without mention of Horizon's invocation of the anti-assignment

clause.").  In *Premier Health Center v. UnitedHealth Group*, 292 F.R.D. 204, 221 (D.N.J. 2013),

the court found that medical providers "received (a) a direct payment from United in response to

a claim for benefits; and (2) one or more letters from United indicating that it had overpaid that

claim and demanding reimbursement of the amount that was overpaid directly to United."  This

was enough to find that "whether United waived its right to assert an anti-assignment provision

is subject to common proof."  *Id.*

Defendants counter that its conduct paying Dr. Bloom directly for services could not

constitute waiver of the anti-assignment clause of the ERISA Plans, because the conduct was

consistent with its Provider Agreement with Dr. Bloom.  Defendants point out that in several

cases where courts found waiver of an anti-assignment clause, the critical fact was that the

provider was a "non-participating provider," rendering payment of benefits inconsistent with the

anti-assignment provision.  Defendants therefore argue that their conduct towards Dr. Bloom is

explained by his Provider Agreement, and not inconsistent with the anti-assignment provision in

the Plan.

      However, Plaintiffs have pleaded explicit confirmations of coverage beyond mere

compliance with the Provider Agreement, amounting to waiver of the anti-assignment clause.

Proving waiver is a separate challenge, but, even if the anti-assignment provision against

Plaintiffs were enforceable, they have plausibly alleged waiver.

      Defendants' final challenge to standing asserts that Plaintiffs cannot claim injury because

the patients from whom Plaintiffs received their right to sue suffered no injury themselves.

Therefore, by Defendants' logic, Plaintiffs have no "injury-in-fact" and no standing.  *See Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Ninth Circuit recently rejected a very

similar argument in *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770

F.3d 1282 (9th Cir. 2014).  There is no Third Circuit precedent deciding the question, and I find

the Ninth Circuit's reasoning to be persuasive.  The *Spinedex* Court held that the insured patients

of the plaintiff provider assigned the rights they possessed "at the time of assignment."  *Id.* at

1291.  The patients possessed the right to sue if their rights under ERISA were violated, and that

is precisely what they assigned.  *Id.* ("the patients' injury in fact *after* the assignment is irrelevant

. . . If the beneficiaries had sought payment directly from their Plans for treatment provided by

Spinedex, and if payment had been refused, they would have had an unquestioned right to bring

suit for benefits."); *see also CardioNet*, 751 F.3d at 178 ("It is a basic principle of assignment

law that an assignee's rights derive from the assignor.  That is, 'an assignee of a contract occupies the *same legal position* under a contract as did the original contracting party, he or she can acquire through the assignment *no more and no fewer rights* than the assignor had . . .").  Thus, the fact that Plaintiffs' patients were not forced to pay for the medical services they received does not invalidate an otherwise enforceable assignment of rights.

For these reasons, I find that Plaintiffs have derivative standing to pursue their ERISA claims as assignees of plan participants.

c.   Declaratory and Injunctive Relief

Defendants next challenge Plaintiffs' ability to seek injunctive or declaratory relief under ERISA.  Defendants take the position that even if the assignment of rights were valid and Plaintiffs had standing to sue, the remedies of injunctive and declaratory relief would not be available.  These remedies would be "outside the logical scope of an assignment."  Defendants' Memorandum in Support of their Motion to Dismiss at 22.

I reject Defendants' argument.  The assignment clause at issue here specifically included patients' rights *and* benefits.  First Amended Complaint at ¶ 122.  It is a commonly applied principle of contract law that "an assignee stands in the shoes of the assignor," and "an assignment will ordinarily be construed in accordance with the rules governing contract interpretation and the circumstances surrounding the execution of the assignment document.  *Crawford Cent. School Dist. v. Com.*, 585 Pa. 131, 137–43, 888 A.2d 616, 620–24 (2005).  Thus, I find that this assignment did include the rights to seek any remedies related to the care they received from Plaintiffs that were available to the plan participants who assigned their rights.

    d.   Supplemental Jurisdiction Over State Law Claims

Defendants ask me to decline to exercise supplemental jurisdiction over Plaintiffs' state law claims if I find that Plaintiffs lack standing for their ERISA claims.  As I have found that Plaintiffs do have standing to bring their federal claims, I reject this argument as moot.

**IV. Conclusion**

For the foregoing reasons, Defendants' Motion will be denied.  An appropriate Order follows.

_____/s/ Gerald Austin McHugh
United States District Court Judge
